*This opinion is nonprecedential except as provided by*
*Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A25-1548**

Cynthia Pitchford as Trustee for the Heirs and Next-of-Kin of D-Angelo Pitchford,
Appellant,

vs.

Luke A Hunter,
Respondent,

Olmsted Medical Center,
Respondent.

**Filed June 15, 2026**
**Affirmed in part, reversed in part, and remanded**
**Wheelock, Judge**
**Concurring in part, dissenting in part, Connolly, Judge**

Olmsted County District Court
File No. 55-CV-22-7183

Elham B. Haddon, Sandberg Haddon Law Firm, Rochester, Minnesota (for appellant)

Mark R. Bradford, Samantha J. Buckman, Bradford Andresen Norrie & Camarotto, Bloomington, Minnesota; and

Steven R. Schwegman, Chad A. Staul, Kenneth H. Bayliss, Quinlivan & Hughes, P.A., St. Cloud, Minnesota (for respondent Luke A. Hunter)

Richard J. Thomas, Bryon G. Ascheman, Burke & Thomas, PLLP, Arden Hills, Minnesota (for respondent Olmsted Medical Center)

        Considered and decided by Wheelock, Presiding Judge; Connolly, Judge; and

Smith, Tracy M., Judge.

**WHEELOCK**, Judge

Appellant challenges the dismissal of her medical-malpractice claims for failure to comply with the expert-identification requirements of Minnesota Statutes section 145.682 (2024) and the summary-judgment dismissal of her claim for violations of the Emergency Medical Treatment and Labor Act (EMTALA), 42 U.S.C § 1395dd (2018). We affirm in part, reverse in part, and remand.

## FACTS

Appellant Cynthia Pitchford, trustee for the heirs and next-of-kin of D-Angelo Pitchford, sued respondents Olmsted Medical Center (OMC) and Dr. Luke A. Hunter following the death of her three-year-old grandson, D-Angelo Pitchford, after he was treated and discharged against medical advice (AMA) by Dr. Hunter at the OMC emergency room.[1] Pitchford submitted one medical-expert affidavit and three expert reports in support of her medical-malpractice claims. The district court dismissed Pitchford's claim for failure to comply with the expert-identification requirements of Minnesota Statutes section 145.682 and granted summary judgment on her claim for violation of EMTALA. We begin with a description of the emergency-room visit and then discuss the expert disclosures.

---

[1] Because this appeal challenges, among other rulings, a grant of summary judgment, we state the facts, including the events described in D-Angelo's parents' deposition testimony, in the light most favorable to Pitchford. *Rygwall v. ACR Homes, Inc.*, 6 N.W.3d 416, 421 (Minn. 2024) (reviewing facts and inferences in light most favorable to appellant on appeal from summary judgment).

D-Angelo was born in 2018 to Darius Pitchford and Andreja Pavlovic.[2] Beginning when he was three months old, D-Angelo experienced bouts of vomiting and abdominal pain approximately every two to three months. The family sought emergency-room care for D-Angelo during these episodes. Pavlovic also called the OMC triage nurse line on several occasions to consult about D-Angelo's symptoms.

Late in the evening on February 13, 2022, Pavlovic called the OMC triage nurse line, reporting that D-Angelo was vomiting and the vomit had the appearance of "coffee grounds." The triage nurse advised Pavlovic to bring D-Angelo to the emergency room immediately. Pavlovic said she would bring D-Angelo to the hospital in an hour or two when D-Angelo's father returned from work. In her deposition, Pavlovic stated that she and Darius had only one car and one child car seat, both of which were with Darius at work that evening.

Shortly after his work shift ended, Darius brought D-Angelo to the emergency room. After a nurse took D-Angelo's vitals, Dr. Hunter, D-Angelo's treating physician, came into the room to see him. Dr. Hunter recommended that they test D-Angelo for streptococcus (strep throat). Darius refused the strep-throat test because D-Angelo had abdominal—not throat—pain and Darius did not think that D-Angelo could have strep throat as he did not attend daycare and would not have contracted strep throat at home.

Dr. Hunter conducted a physical exam of D-Angelo and told Darius that he was going to order blood testing and an x-ray. About 30 to 40 minutes later, a nurse arrived to

---

[2] Because D-Angelo and Darius share a last name with appellant Cynthia Pitchford, we refer to D-Angelo and Darius by their first names.

3

draw D-Angelo's blood but experienced difficulty obtaining a full sample, and a second nurse attempted a blood draw. Darius "was under the impression that there was no blood taken from D-Angelo that night"; however, after the lab reported some blood test results, OMC staff told Darius that D-Angelo had a high white blood cell count and more lab work was needed. Darius questioned how staff could know that D-Angelo had a high white blood cell count if they were unable to draw blood, responding, "What does that mean; more lab work? I was under the impression that you couldn't get any blood." Darius later asked about the x-ray, "but it was like nobody knew of that specific task. They didn't know anything about an x-ray. They just know blood work."

Dr. Hunter also ordered the intravenous (IV) administration of fluids to D-Angelo, but Darius refused to allow the nurses to place an IV line in D-Angelo. In his deposition, Darious explained that this was because, "[i]n order to insert an IV, there has to be a vein. So you're just sitting here poking, poking, poking, poking him." Darius texted Pavlovic, "Man, my a-- 'bout to walk out on they a--." Darius became frustrated with the wait time and that he could see the nurses "just sitting there."[3] While they waited in the room, Darius

---

[3] The patient-care timeline from OMC's records shows the following:
- Feb. 13, 2022, 11:08 p.m.: Darius and D-Angelo arrived at OMC.
- Feb. 13, 2022, 11:17-23 p.m.: Emergency-room triage began. Vital signs taken.
- Feb. 14, 2022, 12:25 a.m.: First examination with Dr. Hunter.
- Feb. 14, 2022, 12:26 a.m.: Laboratory tests and x-ray ordered.
- Feb. 14, 2022, 1:31 a.m.: Initial metabolic-panel results returned.
- Feb. 14, 2022, 1:38 a.m.: Additional labs ordered.
- Feb. 14, 2022, 1:45-55 a.m.: Final lab results returned.
- Feb. 14, 2022, 2:07 a.m.: Darius signed the AMA form and left OMC with D-Angelo after Darius refused treatment and stated that they were leaving.

gave D-Angelo water, which D-Angelo threw up. Darius thought D-Angelo looked like he was feeling better. Darius felt that the nurses were not taking their jobs seriously and wanted to take D-Angelo "elsewhere where they do their job." Darius loudly said, "Man I'm 'bout to go. This is some bullsh-t. I shouldn't have to wait this long."

Dr. Hunter returned and again explained to Darius that D-Angelo's white blood cell count was high. Darius again responded by questioning how D-Angelo's blood was obtained given the problems with the blood draw. Darius then refused to allow additional lab work, later stating that he "felt played" and saying, "It was bullsh-t, because it was not elaborated to me before the nurse went out with his blood." Darius stated that Dr. Hunter did not explain why D-Angelo needed blood work. Darius told Dr. Hunter that he thought Dr. Hunter was lying to him and said, "[Y]our nurses don't know nothing about an x-ray. I keep asking them questions, and nobody knows nothing." At this point, Darius stated that he wanted to leave OMC with D-Angelo AMA without any further lab work or treatment.

Darius does not dispute that Dr. Hunter told him that leaving the emergency department could result in D-Angelo's death. But Darius felt that D-Angelo had experienced worse episodes of illness during his previous hospital visits and decided to leave because he believed that Dr. Hunter was being "nonchalant" about the situation, showed no concern, and said, "with a smile on [his] face," that D-Angelo might die. Dr. Hunter stated in his deposition that he tells every patient who leaves AMA that they may die.

Darius told Dr. Hunter that he was going to bring D-Angelo to a "children's hospital" in the morning. Darius agrees that a nurse brought him a tablet with an electronic form and that Darius signed it on the tablet. Although he acknowledges that the record shows that the form was the AMA form, Darius asserted during his deposition that he did not see the document before he signed it and that he "saw a screen just blinking with a line on it for [him] to sign." Darius also stated: "There was no words, no nothing, not even the date."

Dr. Hunter's notes reflect the following about D-Angelo's OMC emergency-room visit:

> Exam quite concerning. Patient is ill appearing, pale, with increased cap refill, lethargic, and dehydrated. He has moderate diffuse abdominal tenderness. Father initially refused blood work but was convinced by me to do this eventually. Labs revealed patient is hemoconcentrated (Hgb 15.2 and Hct 46). Patient also appears to have AKI with Cr of 1.4 and hyperkalemia of 5.3. WBC was 23.7. Father refused IV for fluids, refused further workup including EKG, abdominal imaging, and UA. He states that he believes that we are lying to him and that his child cannot be dehydrated. I assured him that the patient's clinical exam, labs, and history all support this finding. I notified the father that the patient also has dangerous electrolyte problems that could affect his heart and that he has signs of new kidney failure. I strongly recommended additional workup and interventions, especially IV fluids. Father continues to state that he believes he is being lied to and wants to go AMA without any further workup/intervention. I stated that this is his right but communicated that this may result in permanent morbidity and/or mortality for his child. He acknowledged this and signed out AMA.

After signing the AMA form, Darius left OMC with D-Angelo, and they returned home. Darius discussed the visit with Pavlovic, who asked if Darius had received

6

discharge papers. Darius denied receiving discharge documentation. Pavlovic called the OMC triage nurse line and asked about D-Angelo's white blood cell count. Pavlovic did not ask the nurse any additional questions, later admitted that the information she received during her call did not mean anything to her, and asserted that the information was not explained to her. Pavlovic did not believe that D-Angelo would die, because he was at home with her. Pavlovic and Darius discussed bringing D-Angelo to a children's hospital in the morning after they had gotten "an hour or two of sleep." Pavlovic took D-Angelo upstairs and put him in bed with her around 4:30 a.m. Darius remained downstairs. At some point, Darius heard a "thump," someone say, "Mom," and a "bed roughing around," and he assumed that Pavlovic checked on D-Angelo.

Pavlovic received a phone call at about 6:30 that morning that woke her. She then found D-Angelo deceased on the floor next to the bed.

An autopsy determined D-Angelo's cause of death to be complications from a paraduodenal hernia. In his deposition, Dr. Hunter stated that this type of hernia is sometimes, but not always, detectible via abdominal x-ray or ultrasound and that an "x-ray would have detected abdominal perforation."

*Wrongful-Death Claim and Expert Reports*

By fourth amended complaint, Pitchford brought several claims against respondents. Relevant to this appeal, Pitchford alleged medical malpractice by OMC and Dr. Hunter and violations of EMTALA by OMC.

To support her medical-malpractice claims, Pitchford retained three experts to review D-Angelo's medical records: Dr. Robert Reardon, Dr. John Fortunato Jr., and

7

Dr. David Markenson. Pitchford first submitted an affidavit of expert review, signed by her counsel and Dr. Reardon, describing Dr. Reardon's credentials and expected testimony that respondents violated the standard of care and caused D-Angelo's death. Pitchford later submitted answers to interrogatories that disclosed all three medical experts; none of the answers were signed by the experts. Respondents moved to dismiss the medical-malpractice claims under Minnesota Statutes section 145.682, subdivision 6(c), asserting an insufficient outline of causation, and for summary judgment on the EMTALA claim. During the 45-day cure period provided in subdivision 6(c), Pitchford submitted expert reports prepared and signed by each expert. We next summarize each of the expert reports below.

*Dr. Reardon's Report*

Dr. Reardon is a professor of emergency medicine at the University of Minnesota Medical School and is senior faculty in the department of emergency medicine at Hennepin County Medical Center. Dr. Reardon's expert report states that all medical professionals in the State of Minnesota are mandated reporters that have an obligation to report child neglect, including medical neglect. The report states that "[t]he standard of care in this case would have been to call local police immediately" and that "D-Angelo Pitchford's death could have been avoided if any [OMC] personnel who witnessed his father refusing medical care and removing him from the OMC Emergency Department had called the local police and reported the child maltreatment and the critical nature of the situation." The report concludes "[t]o a reasonable degree of medical certainty D-Angelo would not have died if he had received proper resuscitation and management." The report states generally

8

that "[l]ocal law enforcement agencies understand the law and are quick to respond to place a critically ill pediatric patient on a hold."

*Dr. Fortunado's Report*

Dr. Fortunado is a professor of pediatrics at Northwestern University Feinberg School of Medicine and the director of the Neurointestinal and Motility Program at Lurie Children's Hospital in Chicago. Dr. Fortunado's report states, "If D-Angelo had had the chance for proper stabilization with intravenous fluids and potentially cardiovascular medication support, there is little doubt that he would have survived to have the right diagnostic testing, a correct surgical diagnosis, and definitive treatment." Dr. Fortunado opines that Dr. Hunter should have "alerted security and social work and refused to allow [Darius] from taking [D-Angelo] from the emergency room." Dr. Fortunato's report addresses a relevant time period in which medical care needed to be administered to D-Angelo: "if [D-Angelo] had received immediate resuscitation with continuous cardiopulmonary monitoring within his first 1-2 hours in the emergency room, to a reasonable degree of medical certainty, his condition would not have deteriorated."

*Dr. Markenson's Report*

Dr. Markenson is a clinical professor of pediatrics at the University of Colorado School of Medicine and a professor of public health for New York Medical College. Dr. Markenson's report focuses on administrative medicine[4] and concludes that OMC "failed to meet the standards of care for administrative medicine by not having adequate

---

[4] Administrative medicine refers to hospital policies and procedures.

9

policies for child abuse and maltreatment recognition, action and reporting including educating all covered by the policies in the requirements and monitoring compliance with intervention for non-compliance." The report discusses an OMC policy that requires a written report within 72 hours of suspected child maltreatment and suggests that D-Angelo should have been "held pending social services['] determination that the child was safe to be discharged."

After the signed expert reports were disclosed, respondents filed a reply memorandum of law in support of their motions to dismiss and for summary judgment. The district court granted respondents' motions, agreeing that Pitchford failed to establish a chain of causation between the alleged violation of the standard of care and D-Angelo's death and that Pitchford failed to show that OMC did not discharge its duties under EMTALA to provide D-Angelo with an appropriate medical screening examination or to secure informed consent to refuse examination and treatment for D-Angelo's unstable emergency medical condition.

Pitchford appeals.

**DECISION**

Pitchford challenges the district court's dismissal of her medical-malpractice claim and grant of summary judgment in favor of respondents on her EMTALA claim. First, Pitchford argues that the expert reports she filed establish an outline of a chain of causation between the alleged violation of the standard of care and D-Angelo's death sufficient to withstand a motion to dismiss. Second, she argues that OMC did not discharge its duties under EMTALA to provide D-Angelo with an appropriate medical screening examination

or to secure informed consent to refuse examination and treatment for D-Angelo's unstable emergency medical condition. We address each issue raised in turn, reversing and remanding as to the medical-malpractice claim and affirming as to the EMTALA claim.

**I.    The district court abused its discretion by dismissing Pitchford's medical-malpractice claims under Minnesota Statutes section 145.682, subdivision 6(c), for failure to outline a chain of causation.**

To pursue a medical-malpractice claim, a plaintiff must establish a prima facie case, which is comprised of three essential elements: (1) the applicable standard of care; (2) that the defendant departed from that standard; and (3) "that the defendant's departure from the standard was a direct cause of the patient's injuries" (chain-of-causation requirement). *MacRae v. Grp. Health Plan, Inc.*, 753 N.W.2d 711, 717 (Minn. 2008) (quotation omitted). Plaintiffs typically rely on expert testimony to meet this prima facie showing. *Tousignant v. St. Louis County*, 615 N.W.2d 53, 58 (Minn. 2000). When expert testimony is necessary, the plaintiff must comply with Minnesota's expert-review statute. Minn. Stat. § 145.682, subd. 2. Appellate courts review a dismissal of claims for failure to comply with section 145.682 for an abuse of discretion. *Tousignant*, 615 N.W.2d at 58. Interpretation of the requirements of section 145.682 is a question of law that appellate courts review de novo. *Id.*

*Minnesota Statutes Section 145.682's Requirements for Expert Testimony*

Minnesota Statutes section 145.682 sets out expert-review and -disclosure requirements for medical-malpractice actions that reflect the required elements of a prima facie case—including the chain-of-causation requirement, which is the only element at issue in this appeal.

11

"[T]he primary purpose of the statute is to eliminate nuisance malpractice suits." *Maudsley v. Pederson*, 676 N.W.2d 8, 12 (Minn. App. 2004). Subdivision 2 provides that a plaintiff must serve two affidavits when expert testimony is necessary to establish a prima facie case for medical malpractice. Minn. Stat. § 145.682, subd. 2; *see Anderson v. Rengachary*, 608 N.W.2d 843, 846 (Minn. 2000). The plaintiff's attorney must submit an initial affidavit stating that the attorney has reviewed the facts of the case with "an expert whose qualifications provide a reasonable expectation that the expert's opinions could be admissible at trial and that, in the opinion of this expert, one or more defendants deviated from the applicable standard of care and by that action caused injury to the plaintiff." Minn. Stat. § 145.682, subds. 2, 3(1). The plaintiff's attorney must also submit a second affidavit that meets the requirements of subdivision 4, including that the affidavit must

> state the identity of each person whom plaintiff expects to call as an expert witness at trial to testify with respect to the issues of malpractice or causation, the substance of the facts and opinions to which the expert is expected to testify, and a summary of the grounds for each opinion.

*Id.*, subd. 4(a). Answers to interrogatories that state the required information may also satisfy the statute if they meet certain requirements and are served upon the defendant within 180 days after commencement of discovery. *Id.*

The affidavit or answers to interrogatories must "[a]t a minimum . . . disclose specific details concerning their experts' expected testimony, including the applicable standard of care, the acts or omissions that plaintiffs allege violated the standard of care and an outline of the chain of causation between the violation [of] the standard of care and the plaintiff's damages"—essentially, the second affidavit must establish a prima facie

12

case. *Lindberg v. Health Partners, Inc.*, 599 N.W.2d 572, 577 (Minn. 1999) (quotation omitted). A plaintiff cannot satisfy their burden at the prima facie stage by alleging a "mere possibility of causation." *McDonough v. Allina Health Sys.*, 685 N.W.2d 688, 697 (Minn. App. 2004). Instead, the expert must provide "an outline of the chain of causation between the alleged violation of the standard of care and the claimed damages." *Stroud v. Hennepin Cnty. Med. Ctr.*, 556 N.W.2d 552, 556 (Minn. 1996). "[B]road, conclusory statements as to causation" do not satisfy a plaintiff's prima facie burden. *Id.*

Section 145.682 provides for mandatory dismissal of a medical-malpractice claim under certain circumstances. Minn. Stat. § 145.682, subd. 6(c). "Failure to comply with subdivision 4 because of deficiencies in the affidavit or answers to interrogatories results, upon motion, in mandatory dismissal with prejudice of each action as to which expert testimony is necessary to establish a prima facie case, provided that" the motion to dismiss identifies the deficiencies, the hearing is at least 45 days from the date of service, and the plaintiff does not correct the claimed deficiencies prior to a hearing on the motion. *Id.*; *see Rygwall*, 6 N.W.3d at 424 (stating that Minn. Stat. § 145.682, subd. 6(c), "provides a special statutory dismissal mechanism for medical malpractice claims lacking sufficient support from expert affidavits").

Caselaw applying section 154.682 is also instructive, including the supreme court's decision in *Rygwall*, in which it clarified the causation requirement for medical-malpractice claims. 6 N.W.3d at 434-35.

13

*Section 145.682's Causation Requirement for Expert Disclosures*

In *Rygwall*, the supreme court explained that there is not a heightened requirement for medical-malpractice claims, emphasizing that section 145.682 is "purely procedural" and does not modify common-law concepts. *Id.* at 430-31. The supreme court concluded there that the district court erred by granting summary judgment for the defendant care facility on a medical-malpractice claim made on behalf of the heirs and next-of-kin of a vulnerable resident who died after aspirating food. *Id.* at 420, 439. The plaintiff alleged that the facility's staff should have immediately called 911 and that, as a result of their failure to do so, the resident did not receive appropriate emergency care until three hours later. *Id.* at 420. By that time, the resident's condition had deteriorated, and she died 13 days later. *Id.*

The *Rygwall* court was not persuaded by the facility's assertion that there was no evidence that the resident would have been treated with the same urgency and administered the same care if she arrived at the emergency department three hours earlier. *Id.* at 436-37. The court therefore rejected the facility's arguments that there was no dispute that: (1) if the resident had arrived at the emergency department three hours earlier—immediately after she aspirated—her condition at that time would have been less urgent compared to her condition when she actually arrived and, (2) if her condition was less urgent immediately after she aspirated, she would not have been treated with the same urgency or administered the same care as she received when she finally arrived. *Id.* Reviewing the medical expert's affidavit, the supreme court concluded that there was enough evidence to permit the jury to conclude without speculation that she would have received the same

treatment—administration of antibiotics—if she had been taken to the emergency department immediately after the aspiration event. *Id.* at 437. In fact, the supreme court expressly rejected the argument of the dissent in that case "that it might not have been possible for the [facility] to get [the resident] to the emergency department quickly enough to avoid her death." *Id.*; *cf. Becker v. Mayo Found.*, 737 N.W.2d 200, 215 n.10, 217 (Minn. 2007) (concluding, in the context of the admissibility of expert testimony, that expert testimony that reporting abuse to authorities was the standard of care "would have allowed a reasonable jury to conclude that the accepted standard of care required [the hospital's] physicians to report [the child's] suspected abuse" and rejecting view in the dissenting opinion that the court should not reach the issue because the plaintiffs did not make a sufficient offer of proof that earlier reporting would have prevented the child's injuries). The supreme court in *Rygwall* concluded that, although the expert affidavit was "not always clear on the timeline of events, *sorting out the facts of the timeline* (i.e., when the aspiration event occurred, when [the facility] was notified, and how quickly [the resident] could have received emergency treatment) *is the type of factual dispute a layperson could understand.*" 6 N.W.3d at 438 (emphasis added). The supreme court ruled that the affidavit provided "the expert's version of the how and why of causation," *id.* (quotation omitted), and created a genuine issue of material fact as to whether the facility's acts and omissions in delaying the resident's care had caused her death, *id.* at 439.

The supreme court also addressed how a misunderstanding that section 145.682 requires a higher standard of proof may have arisen, explaining that the "principle [it]

15

announced in *Sorenson*[5] morphed, through a jurisprudential game of 'telephone' among the appellate courts into a requirement that plaintiffs provide a *detailed* chain of causation," resulting in a higher standard of proof for medical-malpractice claims than for other negligence claims. *Id.* at 431 (quotation omitted). It then rearticulated the correct standard for causation, stating:

> To support a summary judgment motion in a medical malpractice case where expert testimony is needed, the expert must provide an opinion with proper foundation and enough information about the specific case to reassure the court that the jury will have sufficient information to draw a reasonable inference—without speculating—that the provider's conduct caused the plaintiff's injury. This is the same standard that applies to any plaintiff facing a summary judgment challenge to a negligence claim that requires expert testimony.

*Id.* at 434-35.

With this understanding of the causation requirements in mind, we next consider the expert reports Pitchford filed.

*Pitchford's Expert Reports*

Pitchford argues that the district court abused its discretion by applying the wrong standard—the heightened standard rejected by the supreme court in *Rygwall*—to evaluate the expert submissions when it determined that Pitchford's experts' reports failed to outline the chain of causation. Pitchford specifically argues that the district court "insist[ed] on a detailed chain of causation" and "insist[ed] on an offer of proof that may be appropriate in the context of a motion for summary judgment but was not appropriate in the context of a

---

5 *Sorenson by Sorenson v. St. Paul Ramsey Med. Ctr.*, 457 N.W.2d 188 (Minn. 1990).

16

dismissal based on the statute." She contends that the opinions offered by her three medical experts satisfy section 145.682's causation requirement because all three experts agree that OMC and Dr. Hunter had a statutory duty to make a mandatory report of medical neglect and to call law enforcement to prevent D-Angelo from leaving the emergency room because they witnessed medical neglect of D-Angelo by Darius. Respondents argue that the district court applied the correct standard and properly concluded that Pitchford's expert submissions require speculation and fail to outline the chain of causation as required under section 145.682 and caselaw.[6] We agree with Pitchford.

---

[6] Respondents also argue that dismissal with prejudice is required because Pitchford failed to meet the procedural requirements of section 145.682. Specifically, respondents assert that the expert reports were not in affidavit form and that the answers to interrogatories were not signed by the experts. *See* Minn. Stat. § 145.682, subd. 4(a) (requiring that the affidavit of expert disclosure or answers to interrogatories containing the information obliged by subdivision 4 "be signed by each expert listed in the affidavit and by the plaintiff's attorney"). Under the statute, a motion to dismiss based on an insufficient expert affidavit must identify "the claimed deficiencies" and the plaintiff must have at least 45 days to correct "the claimed deficiencies." Minn. Stat. § 145.682, subd. 6(c). In the respondents' motions to dismiss under section 145.682, they mentioned in a footnote that the interrogatories' answers were unsigned but the only deficiency they argued was that the expert disclosures failed to establish an outline of causation. During the 45-day cure period, Pitchford submitted the three expert reports and argued in a memorandum of law opposing the motions that the reports satisfied the outline-of-causation requirement. In their reply memorandum of law, respondents addressed the newly filed expert reports but again argued only that the reports failed to outline causation. In its order dismissing Pitchford's claims, the district court observed that Pitchford's answers to interrogatories were signed only by Pitchford's counsel and stated, "This Court has relied on the expert reports themselves, as they are signed by the experts. Because the disclosures do not meet the statutory substantive requirements, the Court makes no decision on the procedural particularities of these disclosures." Respondents' argument that we must affirm based on alleged procedural deficiencies fails because respondents failed to identify those alleged deficiencies in their motions to dismiss and Pitchford was therefore not given the opportunity to correct them as required by statute. *See id.* Furthermore, appellate courts generally address only those questions that were presented to and considered by the district court. *Thiele v. Stich*, 425 N.W.2d 580, 582 (Minn. 1988).

Although the respondents did not assert that the expert reports failed to satisfy the first two requirements—they challenged only causation—we first discuss how the reports met the first two requirements to give context for the third requirement.

The first requirement of an expert affidavit is to identify the applicable standard of care. Dr. Robert Reardon is a professor of emergency medicine at the University of Minnesota Medical School and is senior faculty in the department of emergency medicine at Hennepin County Medical Center. Dr. Reardon opined that the standard of care for an emergency-department physician or hospital healthcare provider who witnesses child maltreatment is to immediately report the maltreatment to the proper authorities under Minnesota's mandatory-reporting law. He explained that maltreatment includes medical neglect by a parent. He also explained that emergency departments "play a pivotal role in detecting and reporting cases of child maltreatment." He opined that, "[i]f a parent is attempting to leave with a critically ill child who may die without necessary medical care," medical providers are "obligated to act immediately to protect the child's life."

The standard of care was also addressed in the report from Dr. John E. Fortunato, a professor of pediatrics at the Northwestern University Feinberg School of Medicine and the director of the Neurointestinal and Motility Program at Lurie Children's Hospital in Chicago. Dr. Fortunato explained that emergency-department physicians are mandated reporters of abuse and neglect and are obligated to alert authorities when they witness maltreatment of patients in the emergency department. He stated that it is "the responsibility of a physician to protect the life and safety of any minor or vulnerable patient."

18

Finally, the standard of care for OMC was addressed in the report by Dr. David Markenson, a clinical professor of pediatrics at the University of Colorado School of Medicine and a professor of public health for New York Medical College who has experience and expertise in hospital administration and administrative medicine. Dr. Markenson explained that hospitals must have adequate policies for the recognition of child abuse and maltreatment and for response to and reporting of abuse and maltreatment.

Together, the three expert witness reports identified the standard of care: healthcare providers in emergency departments must immediately report maltreatment in the form of medical neglect to the proper authorities, and hospitals must maintain appropriate policies to meet that obligation.

The second requirement of the expert's affidavit is to identify the acts and omissions of defendants that a plaintiff alleges violated the standard of care. Dr. Reardon explained that the medical record made it "very clear" that D-Angelo was "critically ill" and was "severely dehydrated"—which can lead to life-threatening consequences—when he was seen in the OMC emergency department by Dr. Hunter. Dr. Reardon stated that "Dr. Hunter was correct" when Dr. Hunter advised D-Angelo's father, Darius, "that refusing medical care and removing his son from the hospital could result in permanent morbidity or mortality for his child." Dr. Reardon opined that, given D-Angelo's critical condition and the father's intention to remove the child from the hospital, "[t]he standard of care in this case would have been to call local police immediately." Dr. Reardon opined that Dr. Hunter and OMC personnel "failed to report the child maltreatment (medical neglect) they witnessed when D-Angelo's father refused medical care and left the

Emergency Department with his critically ill son" and that "Dr. Hunter should not have told D-Angelo's father that it was his right to refuse care for his critically ill son."

In his report, Dr. Fortunato also opined that D-Angelo presented as "critically ill" at OMC and in "obvious shock" necessitating "immediate and appropriate resuscitation" given the symptoms of "poor cardiovascular perfusion." He opined that, "while Dr. Hunter's proposed diagnostic and treatment plan were appropriate, allowing D-Angelo's father to leave the hospital with a critically ill child who likely had a bowel obstruction, but who definitely was in shock was a devastating breach of standard of care." He stated that "Dr. Hunter should have alerted security and social work and refused to allow D-Angelo's father from taking him from the emergency room."

Dr. Markenson opined that OMC's policy regarding child maltreatment fails to provide clear and accessible direction "for handling parent refusal of needed care." With respect to the requirements of OMC's existing policy, Dr. Markenson also opined that they were not followed here—for example, by not immediately reporting to county social services when Darius removed D-Angelo AMA.

Together, the three expert reports described the acts and omissions by respondents that Pitchford alleges violated the applicable standard of care: respondents failed to meet their obligations to make and to ensure an immediate report to proper authorities of the medical neglect of a child who was known to be critically ill.

With that background, we turn to the only disputed issue under section 145.682— whether the expert reports submitted by Pitchford outlined a chain of causation between

20

the violation of the standard of care and D-Angelo's death. Each of the expert reports offers an opinion about causation.

Dr. Reardon opined that the respondents' failure to report Darius's medical neglect of denying his critically ill child the treatment that he needed led to D-Angelo's death. Dr. Reardon stated that "[l]ocal law enforcement agencies understand the law and are quick to respond to place a critically ill pediatric patient on a hold" and that "prompt and appropriate medical care would have saved D-Angelo's life." Dr. Reardon described the "immediate resuscitation with IV fluids and other treatment" that D-Angelo needed to treat his shock and identified the tests that needed to be performed to manage and to diagnose the child's condition in the emergency department. He opined that "[t]o a reasonable degree of medical certainty D-Angelo would not have died if he had received proper resuscitation and management" as described in his report.

Dr. Fortunato opined that D-Angelo "died most likely as a result of shock (inadequate oxygenated blood perfusion to his organs)." He opined that D-Angelo was "critically ill" at OMC and was in "obvious shock" and stated that "immediate and appropriate resuscitation upon presentation to the emergency room was mandatory" in a child that was presenting with the symptoms of poor cardiovascular perfusion that D-Angelo showed. He wrote, "Had D-Angelo received timely and appropriate cardiovascular resuscitation, there is very little doubt that his condition would have stabilized long enough for definitive and lifesaving treatment. Removing D-Angelo from this setting precluded treatment of his shock is [sic] directly responsible for his death based on my review and assessment of his case." Dr. Fortunato opined that the child's conditions

21

were reversible and that prompt treatment "would have likely saved his life to a reasonable degree of medical certainty." Specifically, he stated that, if D-Angelo "had received immediate resuscitation with continuous cardiopulmonary monitoring within his first 1-2 hours in the emergency room, to a reasonable degree of medical certainty, his condition would not have deteriorated" and D-Angelo could then have received the diagnostic testing and ultimately the surgery that he needed to address the duodenal hernia and its effects.

Additionally, Dr. Markenson opined that OMC's failures to meet the standard of care for administrative medicine by having an inadequate policy and failing to follow the standard of care when a child is suffering maltreatment "were factually causative of [D-Angelo's] injuries and death."

Together, the expert reports explain how the respondents' negligent act of failing to immediately report Darius's medical neglect of the child to the police foreseeably led to D-Angelo not receiving the lifesaving care that he needed and contributed to his death. Both Dr. Reardon's and Dr. Fortunato's expert reports identify the treatment and diagnostic steps that medical providers would have taken had D-Angelo not been removed from the emergency department. Dr. Reardon opined that the steps to correct the "fluid and electrolyte derangements," the imaging tests that would diagnose an internal hernia and dead bowel, and the surgical intervention to address the condition "are routinely performed in emergency departments around the country every day." Dr. Fortunato specifically opined that immediate resuscitation of D-Angelo and cardiopulmonary monitoring within the first one to two hours in the emergency room would have arrested the deterioration of D-Angelo's condition so that the cause of his illness could have been identified and treated.

22

Dr. Reardon—an expert in emergency medicine—explained that law enforcement officials quickly respond to place critically ill pediatric patients on an emergency hold when those officials receive mandatory reports of medical neglect.

To determine whether these reports meet the requirement for causation, we invoke the guidance from *Rygwall* that the plaintiff's obligation to provide an "*outline* of the chain of causation," 6 N.W.3d at 431 (quoting *Sorenson*, 457 N.W.2d at 193), means that the expert affidavit "must include an opinion on causation that is supported with reference to specific facts in the record connecting the conduct of the defendant provider to the injury suffered by the harmed patient," *id.* at 434. Our review of the expert reports here reveals that each report referred to specific facts in the record that connected respondents' failure to report Darius's medical neglect in violation of the standard of care to the failure to address D-Angelo's critical condition and to diagnose and treat the underlying cause, which led to his death.

Indeed, in this case as compared to *Rygwall*, there is even less uncertainty about the causal connection.[7] Unlike in *Rygwall*, there is no dispute about the type and appropriateness of the emergency care that D-Angelo would have received from Dr. Hunter and OMC had he remained at OMC. As for timing, as discussed above, Dr. Reardon opined that law enforcement responds quickly with emergency holds of critically ill pediatric patients in the face of reports of medical neglect and Dr. Fortunato opined that emergency

___

[7] We observe that the procedural posture of the proceedings considered on appeal in *Rygwall* is different from that in this case. In *Rygwall*, the proceedings were at the summary-judgment stage, while here, the appeal is of a decision at a more preliminary stage of the proceedings—a motion to dismiss under section 145.682.

23

care provided to D-Angelo within one to two hours would have been lifesaving. By dismissing Pitchford's claims based on the expert reports' supposed failure to adequately specify the timelines—especially the timeline of the actions that would have been taken by local law enforcement responding specifically to OMC—the district court held Pitchford to a higher burden than she would have faced had respondents brought a motion for summary judgment.

The district court reasoned that the expert reports did not establish causation because they did not address when law enforcement would have arrived, whether law enforcement would have placed an emergency hold on D-Angelo, whether the hold would have been in time for D-Angelo to receive the care he needed, or what any security staff or social workers in the hospital would have done and under what authority. This reasoning ultimately requires that the expert reports compare the local law enforcement response times for neglect reports made by OMC to the length of time needed to begin or complete the medical interventions to treat D-Angelo. The dissent's view would similarly require plaintiffs essentially to prove their entire case at the expert-report stage.[8] In this case, Pitchford would have needed to obtain testimony from social workers and Rochester police officers about the details of their practices in responding to reported child abuse and submit

---

[8] In concluding that the expert reports did not establish an outline of the chain of causation, the dissent hews too closely to the detailed chain-of-causation requirement expressly rejected by the supreme court in *Rygwall*, and in doing so, cites two cases that predate *Rygwall*: *Maudsley*, 676 N.W.2d at 14, and *Leubner v. Sterner*, 493 N.W.2d 119, 122 (Minn. 1992). In addition, the issues in *Leubner* did not involve section 145.682. 493 N.W.2d at 122.

it along with her expert reports. At the motion-to-dismiss stage, this reasoning demands too much.

The medical experts cannot be expected to attest to the response time of local law enforcement to reports of child abuse by OMC, nor can they be expected to testify to the legal authority for placing critically ill children in emergency departments on emergency holds. Both of these topics are simply outside the realm of a medical expert's knowledge or expertise, and neither topic involves information requiring medical-expert testimony to help the jury decide the case. *Cf. Bernloehr v. Cent. Livestock Ord. Buying Co.*, 208 N.W.2d 753, 755 (Minn. 1973) (explaining that medical-expert testimony is required "[w]here a question involves obscure and abstruse medical factors" outside the knowledge of a reasonable lay person).

The medical experts *can* attest, as they did here, to their opinion and experience that law enforcement responds quickly to reports of medical neglect from healthcare providers and that law enforcement uses emergency holds to prevent medical neglect of critically ill pediatric patients in hospitals. As for the time required for D-Angelo to receive the medical care he needed, Dr. Fortunato opined that D-Angelo would have survived had he received the emergency-department care he needed within one to two hours, which then would have permitted diagnosis of the hernia and surgical intervention. The expert reports did not leave a gap in the chain of causation that medical experts needed to fill; they contain far more than "a broad, general statement without any reference to the facts of the specific case." *Rygwall*, 6 N.W.3d at 433. To require more is to demand the level of detail that the supreme court rejected in *Rygwall*. *Id.* at 429, 435.

25

Our conclusion is further supported by the supreme court's decision in a general negligence case in which the claim was premised on a failure to report suspected child abuse to law enforcement under Minnesota's mandatory-reporting law. In *Jepson v. County of Pope*, the plaintiff brought a wrongful-death suit against the county after a child died at the hands of his father's girlfriend following reports of suspected child abuse. 966 N.W.2d 472, 475 (Minn. 2021). The plaintiff alleged that the county's child-protection workers negligently caused the child's death by violating their obligation under Minnesota's mandatory-reporting law to notify local law enforcement of reports that they had received of suspected child abuse. *Id.* at 491.

The supreme court held that the district court erred by granting summary judgment for the county based on causation. *Id.* at 492. The county had submitted an affidavit from its director of human services explaining that the county did not cross-report suspected child abuse to local law enforcement because "Pope County law enforcement had a policy of not independently investigating or assessing reports of child abuse." *Id.* The plaintiff responded with an expert affidavit from a social worker with child-protection experience in a different county opining that, had Pope County forwarded the reports it had received to local law enforcement, "law enforcement would have undertaken a more thorough investigation," which likely would have produced evidence that the father's girlfriend was abusing the child and resulted in county or law enforcement action to protect the child. *Id.* at 491. The district court concluded that there was not a genuine issue of material fact regarding causation because there was "nothing in the record to suggest cross reporting to

law enforcement would have changed this horrible tragedy, given law enforcement by its policy did not independently investigate or assess any of these claims." *Id.* at 492.

The supreme court rejected that conclusion. It based its decision on the reasons that "cross-reporting duties and law enforcement obligations are a matter of state law" and that "issues of credibility are for the jury." *Id.* Given that the evidence in *Jepsen* created an issue of fact on causation sufficient to go to the jury, it is hard to see how the medical-expert reports here did not provide a sufficient outline of causation when the experts identified a violation of respondents' standard of care to immediately report suspected medical neglect to law enforcement under Minnesota's mandatory-reporting law and identified the medical steps that would have followed and saved D-Angelo's life had the report to law enforcement been made.

We are satisfied that the expert reports Pitchford filed extend beyond the type of "brief conclusory statements," *Tousignant*, 615 N.W.2d at 60, that our appellate courts previously deemed inadequate to "explain[] to the jury the 'how' and the 'why' the malpractice caused the injury," *Teffeteller v. Univ. of Minn.*, 645 N.W.2d 420, 429 n.4 (Minn. 2002). *See also Rygwall*, 6 N.W.3d at 429 (stating that a plaintiff proves causation by showing "that it is more likely than not that the defendant's conduct was a substantial factor in bringing about the result" (quotation omitted)). In sum, we conclude that the district court abused its discretion by dismissing Pitchford's medical-malpractice claims under Minnesota Statutes section 145.682, subdivision 6(c), for failure to outline a chain of causation.

**II.** **The district court did not err by granting OMC's motion for summary judgment as to Pitchford's EMTALA claim.**

Appellate courts review a grant of summary judgment de novo, "view[ing] the evidence in the light most favorable to the nonmoving party . . . and resolv[ing] all doubts and factual inferences against the moving parties." *Henson v. Uptown Drink, LLC*, 922 N.W.2d 185, 190 (Minn. 2019) (quotation omitted). "A party need not show substantial evidence to withstand summary judgment. Instead, summary judgment is inappropriate if the nonmoving party has the burden of proof on an issue and presents sufficient evidence to permit reasonable persons to draw different conclusions." *Schroeder v. St. Louis County*, 708 N.W.2d 497, 507 (Minn. 2006) (emphasis omitted).

Pitchford argues first that the district court erred by granting summary judgment in favor of OMC on her EMTALA claim because OMC knew that D-Angelo had an emergency medical condition, did not stabilize his medical condition, and did not transfer or offer to transfer D-Angelo to another facility. Pitchford argues second that OMC did not take all reasonable steps to secure Darius's informed consent when he refused treatment for D-Angelo and removed him from the emergency room AMA.

EMTALA requires that hospitals provide necessary stabilizing treatment for emergency medical conditions:

> If any individual (whether or not eligible for benefits under this subchapter) comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide either—(A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or(B) for transfer of the individual to

another medical facility in accordance with subsection (c).

42 U.S.C. § 1395dd(b)(1). EMTALA's provisions also establish that a hospital has met the requirements outlined above if a patient refuses to consent to treatment:

A hospital is deemed to meet the requirement of paragraph (1)(A) with respect to an individual if the hospital offers the individual the further medical examination and treatment described in that paragraph and informs the individual (or a person acting on the individual's behalf) of the risks and benefits to the individual of such examination and treatment, but the individual (or a person acting on the individual's behalf) refuses to consent to the examination and treatment. The hospital shall take all reasonable steps to secure the individual's (or person's) written informed consent to refuse such examination and treatment.

42 U.S.C. § 1395dd(b)(2).

Congress enacted EMTALA to prevent emergency rooms from turning patients away due to their inability to pay. *See Summers v. Baptist Med. Ctr. Arkadelphia*, 91 F.3d 1132, 1136 (8th Cir. 1996) (stating that EMTALA was enacted "to address a distinct and rather narrow problem—the 'dumping' of uninsured, underinsured, or indigent patients by hospitals who did not want to treat them"). EMTALA provides a private civil cause of action, authorizing personal-injury damages and equitable relief for "[a]ny individual who suffers personal harm as a direct result of a participating hospital's violation of a requirement" of EMTALA. 42 U.S.C. § 1395dd(d)(2)(A).

The Eighth Circuit has held that EMTALA "does not create a general federal cause of action for medical malpractice in emergency rooms." *Hunt by Hunt v. Lincoln Cnty. Mem'l Hosp.*, 317 F.3d 891, 894 (8th Cir. 2003) (quotation omitted). "EMTALA imposes

29

only a limited duty on hospitals with emergency rooms. It is not a substitute for state-law malpractice actions. It does not guarantee proper diagnosis or provide a federal remedy for medical negligence." *Summers*, 91 F.3d at 1137. "EMTALA is not intended to duplicate preexisting legal protections, but rather to create a new cause of action, generally unavailable under state tort law, for what amounts to failure to treat." *Id.* (quotation omitted).

Pitchford's EMTALA claim fails as a matter of law because the statute's stabilization requirement was met per 42 U.S.C. § 1395dd(b)(2) when Darius refused treatment for D-Angelo by withdrawing his consent to the efforts to diagnose and treat D-Angelo and removing D-Angelo from the emergency room AMA.

Pitchford argues that Darius did not give informed consent, asserting that Darius signed a "blank screen" and that respondents failed to explain to Darius the need for further blood testing and imaging and the seriousness of D-Angelo's condition as compared to previous bouts of illness. But Pitchford does not cite authority to support the assertion that EMTALA requires further efforts than those made by OMC. Darius was told directly and in no uncertain terms that D-Angelo may die if Darius declined treatment and removed D-Angelo from the emergency room AMA. Darius was convinced that Dr. Hunter and OMC staff were lying to him. It is unclear how any other efforts—offers of further medical examination and treatment or attempts to further inform Darius of the risks and benefits to D-Angelo of such examination and treatment—would have changed Darius's understanding of the situation. And though Pitchford asserts that Darius signed a blank screen, EMTALA requires only that the risks and benefits be explained and that "[t]he

30

hospital . . . take all reasonable steps to secure the individual's (or person's) written informed consent to refuse such examination and treatment." 42 U.S.C. § 1395dd(b)(2). Even resolving the factual dispute about the blank screen presented for signature in Pitchford's favor, the requirement to take "all reasonable steps" is not an absolute requirement to obtain written consent. Pitchford agrees that respondents told Darius that D-Angelo may die if Darius removed him from the emergency room AMA. OMC fulfilled its treatment obligation under EMTALA—it never turned D-Angelo away or refused to provide examination and treatment.

Thus, there is no genuine issue of fact that, if resolved in Pitchford's favor, would establish that OMC refused to treat or stabilize D-Angelo in violation of EMTALA. Accordingly, the district court did not err by granting summary judgment on Pitchford's EMTALA claim.

In sum, we affirm the district court's grant of summary judgment on Pitchford's EMTALA claim and reverse the district court's dismissal of Pitchford's medical-malpractice claims under Minnesota Statutes section 145.682 and remand the claims for further proceedings. In so doing, we do not express an opinion on the merits of Pitchford's medical-malpractice claims at future stages of litigation.

**Affirmed in part, reversed in part, and remanded.**

**CONNOLLY,** Judge (concurring in part, dissenting in part)

I concur in Section II of the majority's opinion, but I respectfully dissent from Section I. I agree with the district court and respondents Olmsted Medical Center (OMC) and Dr. Luke A. Hunter that the expert reports submitted by appellant Cynthia Pitchford do not establish the chain of causation required for a prima facie medical-malpractice claim. *See MacRae v. Grp. Health Plan, Inc.*, 753 N.W.2d 711, 717 (Minn. 2008) (stating that the prima facie case for medical malpractice requires (1) a showing of the applicable standard of care, (2) that the defendant departed from that standard, and (3) "that the defendant's departure from the standard was a direct cause of the patient's injuries"); *see also* Minn. Stat. § 145.682 (2024) (setting out expert-review and -disclosure requirements for medical-malpractice actions that reflect the required elements of a prima facie case).

Plaintiffs typically rely on expert testimony to meet this prima facie showing. *Tousignant v. St. Louis County*, 615 N.W.2d 53, 58 (Minn. 2000). When expert testimony is necessary, plaintiffs must comply with Minn. Stat. § 145.682, subd. 2. Appellate courts review a dismissal for failure to comply with section 145.682 for an abuse of discretion. *Id.* However, interpretation of the requirements of section 145.682 is a question of law that appellate courts review de novo. *Id.*

A plaintiff's attorney must serve two affidavits when expert testimony is necessary to establish a prima facie case for medical malpractice. Minn. Stat. § 145.682, subd. 2. The first affidavit states that the attorney has reviewed the facts of the case "with an expert whose qualifications provide a reasonable expectation that the expert's opinions could be admissible at trial and that, in the opinion of this expert, one or more defendants deviated

from the applicable standard of care and by that action caused injury to the plaintiff." *Id.*,

subd. 3(1). The second affidavit must

> state the identity of each person whom plaintiff expects to call
> as an expert witness at trial to testify with respect to the issues
> of malpractice or causation, the substance of the facts and
> opinions to which the expert is expected to testify, and a
> summary of the grounds for each opinion.

*Id.*, subd. 4(a).

The affidavit must "[a]t a minimum . . . disclose specific details concerning their

experts' expected testimony, including the applicable standard of care, the acts or

omissions that plaintiffs allege violated the standard of care and an outline of the chain of

causation between the violation of the standard of care and the plaintiff's damages";

essentially, the second affidavit must establish a prima facie case. *Lindberg v. Health

Partners, Inc.*, 599 N.W.2d 572, 577 (Minn. 1999) (quotation omitted). Plaintiffs cannot

satisfy this burden at the prima facie stage by alleging a "mere possibility of causation."

*McDonough v. Allina Health Sys.*, 685 N.W.2d 688, 697 (Minn. App. 2004). Instead, the

expert must provide "an outline of the chain of causation between the alleged violation of

the standard of care and the claimed damages." *Stroud v. Hennepin Cnty. Med. Ctr.*,

556 N.W.2d 552, 555-56 (Minn. 1996). Broad, conclusory statements as to causation do

not satisfy a plaintiff's prima facie burden. *Id.* at 556.

"Failure to comply with subdivision 4 [which relates to the requirements of the

second affidavit] because of deficiencies in the affidavit or answers to interrogatories

results, upon motion, in mandatory dismissal with prejudice of each action as to which

expert testimony is necessary to establish a prima facie case," provided that the motion to

dismiss identifies the deficiencies, the hearing is at least 45 days away from the date of service, and the plaintiff does not correct the claimed deficiencies prior to a hearing on the motion. Minn. Stat. § 145.682, subd. 6(c); *see also Rygwall v. ACR Homes, Inc.*, 6 N.W.3d 416, 424 (Minn. 2024) (stating that Minn. Stat. § 145.682, subd. 6(c), "provides a special statutory dismissal mechanism for medical malpractice claims lacking sufficient support from expert affidavits").

In *Rygwall*, the supreme court clarified the causation requirement for medical-malpractice claims. It stated that a plaintiff in a common-law negligence claim must "show that the defendant's negligent act was a foreseeable, substantial factor in bringing about the injury" and must "convince the jury that the harm would not have occurred without the negligent act"; moreover, this standard applies to medical-malpractice claims. *Rygwall*, 6 N.W.3d at 429. The supreme court rejected the view that section 145.682 requires a higher standard of proof and articulated the correct standard for causation, stating:

> To support a summary judgment motion in a medical malpractice case where expert testimony is needed, the expert must provide an opinion with proper foundation and enough information about the specific case to reassure the court that the jury will have sufficient information to draw a reasonable inference—without speculating—that the provider's conduct caused the plaintiff's injury. This is the same standard that applies to any plaintiff facing a summary judgment challenge to a negligence claim that requires expert testimony.

*Id.* at 434-35.

*Rygwall* applied this standard, concluded that the appellant had "raised a genuine issue of material fact" as to whether the respondent, ACR Homes, Inc., caused Amy's death, and reversed the summary judgment granted to ACR. *Id.* at 439.

*Rygwall* is clearly distinguishable from this case on its facts. In that case, the decedent, Amy, was "a profoundly vulnerable woman in the care of respondent ACR Homes, Inc." *Id.* at 420. Amy aspirated and began to show signs of respiratory distress while she was eating lunch at her day program. *Id.* at 421. A day program staff member called ACR at 12:35 p.m. to notify Amy's ACR residential coordinator (RC) of her condition and was told that someone from ACR would come to pick Amy up at the day program. *Id.* at 422. The RC spent time on her computer looking for an urgent care facility that would accept Amy's insurance and did not arrive at the day program to pick Amy up until 1:41. *Id.* En route to the urgent care center, they stopped at a different clinic to see if its urgent care center was open, but it was not. *Id.* When they arrived at the urgent care center at 2:49, the RC "did not bring up the details of Amy's condition to the receptionist or other staff." *Id.* at 423. Nor did the RC tell the nurse who first attended Amy that she feared Amy had aspirated, and the nurse did not listen to Amy's lungs. *Id.*

As they waited for a doctor, Amy's lips began turning blue and the RC pressed a call button. *Id.* Another nurse came, listened to Amy's lungs, and found she had low oxygen saturation. *Id.* The RC for the first time reported that Amy might have aspirated while eating lunch some hours earlier. *Id.* The nurse called 911 around 3:30, an ambulance arrived six minutes later, and Amy was taken to the hospital, where she arrived at 3:53. *Id.* Emergency department doctors there determined that Amy was critically ill and started

intravenous antibiotics. *Id.* at 424. Amy was diagnosed with acute respiratory distress syndrome (ARDS) and florid sepsis the next day; her condition worsened, and she died about two weeks later. *Id.*

The supreme court concluded that the appellant, the trustee for Amy's heirs and next of kin, had produced evidence from which "a jury could reasonably believe that ACR's failure to seek immediate emergency care for Amy was a substantial cause of Amy's death." *Id.* at 435, 439. The supreme court described the expert's affidavit:

> On causation, [the expert] expressly stated his opinion to a reasonable degree of medical certainty that had Amy's condition been "immediately acted on with rapid evaluation and treatment, there is a reasonable degree of medical certainty her condition would never have deteriorated to ARDS, septic shock, multi-system organ failure, and ultimately her death."
>
> . . . [I]n support of this opinion, [the expert] discussed numerous specific facts from the record connecting the specific conduct of ACR to the injury suffered by Amy. Based on information in the record that was specific to Amy, he identified the treatment Amy would have received (aggressive administration of antibiotics) and the mechanism by which the treatment she received would have interrupted Amy's deadly progression . . . . [The expert's] 10-page affidavit explains "how" and "why" ACR's alleged malpractice caused Amy's injury.

*Id.* at 435-36.

In its analysis, the supreme court refuted the objection that there was no evidence showing that Amy would have received antibiotics had she sought emergency medical treatment earlier by noting that the hospital gave Amy antibiotics "almost immediately upon her arrival" because "the doctors at the emergency department (unlike providers at urgent care) were immediately told that Amy might have aspirated." *Id.* at 436.

The supreme court also refuted the objection that there was no evidence showing that earlier administration of antibiotics would have interrupted Amy's progression to more serious illness and death. *Id.* at 438. The expert

> expressly opined in his affidavit that early and aggressive intervention with antibiotics decreases both morbidity and mortality in patients with sepsis and septic shock—one of the links in the chain of Amy's deterioration and death. [The expert] cited medical research that delay in administering antibiotics increases the risk of worsening health (morbidity) and death. More specifically, one of the findings in the reports states that for each hour of delay, it is increasingly *more* likely . . . that the patient will become more ill and die.

*Id.* at 438-39.

Here, the expert reports do not explain to the jury the "how" and the "why" the malpractice caused the injury. *See id*. at 436. Even an outline of the chain of causation requires all the links in that chain to be present.

Respondents argue that the district court applied the correct standard properly and concluded that appellant's expert submissions require speculation and fail to sufficiently outline the chain of causation as required under section 145.682 and caselaw and fail to sufficiently outline the chain of causation as required under section 145.682 . I agree.

The district court set out the chain of causation put forth by each expert:

**Dr. Robert Reardon's report**

Dr. Reardon's report stated that "[t]he standard of care in this case would have been to call local police immediately." The district court observed that, for Dr. Reardon, the links in the chain were that: (1) staff calls law enforcement; (2) law enforcement arrives; (3) "law enforcement places D-Angelo on a legal hold because 'all law enforcement

agencies in Minnesota are fully aware'" of Minn. Stat. § 260C.007 (2024)[1] and "will readily place a critically ill pediatric patient on hold"; (4) "the hold would allow for D-Angelo to be treated appropriately"; and (5) "D-Angelo would have been treated and not died." The district court found that the second, third, and fourth links were speculative. According to the district court, the second speculated that law enforcement would arrive while D-Angelo was still in the emergency room; the third speculated that law enforcement would comply with OMC's request for a legal hold on a child whose custodial parent wanted to withdraw the child and claimed to be taking the child to another hospital; and the fourth speculated that the length of the hold would be sufficient for medical personnel to provide the necessary treatment for D-Angelo.

Dr. Reardon emphasizes the importance of immediate medical intervention. But this is the type of an "earlier is better" treatment and diagnosis opinion that has been found insufficient to satisfy Minn. Stat. § 145.682, subd. 4. *See Leubner v. Sterner*, 493 N.W.2d 119, 122 (Minn. 1992) (holding that a delay in diagnosis and treatment is an insufficient theory to satisfy causation); *Maudsley v. Pederson*, 676 N.W.2d 8, 14 (Minn. App. 2004) (holding that an expert affidavit was insufficient where the affidavit failed to set forth a detailed chain of causation relating to how a delay in treatment resulted in the harm to the claimant).

Although Dr. Reardon's report explains some of the medical steps that would have been required to complete the diagnosis and initiate treatment of D-Angelo, such as

---

[1] Minnesota Statutes section 260C.007 defines various terms relevant to juvenile safety and placement.

additional blood draws and lab tests, a computed tomography scan, and the administration of IV fluids and antibiotics, it does not identify the amount of time needed to begin or complete those steps or compare that length of time to law enforcement's response times for reports of neglect made by OMC staff. Dr. Reardon's report simply asserts that D-Angelo's "death could have been avoided" if staff had called the police and concludes that, "[t]o a reasonable degree of medical certainty, D-Angelo would not have died if he had received proper resuscitation and management." But even assuming that the police had immediately responded, intervened, and prevented the removal of D-Angelo, his report is silent as to both the time required to implement the necessary medical interventions to diagnose and treat D-Angelo and the likelihood of those interventions preventing his death.

The district court determined that Dr. Reardon's report was insufficient because it was too speculative and without foundational support: it failed to address whether law enforcement would have arrived and placed an emergency hold on D-Angelo, whether this would have prevented D-Angelo's removal from the OMC, and, significantly, whether law enforcement's actions would have resulted in D-Angelo receiving the necessary medical treatment in time to prevent his death.

**Dr. John T. Fortunato's report**

For Dr. Fortunato, the standard of care was breached when D-Angelo's father was allowed to remove him from the hospital because (1) "[a] parent willing to unnecessarily risk the life of his/her child is not allowed under any conditions to be released by signing out against medical advice"; Dr. Hunter "should have made it clear to D-Angelo's father that his child was in critical condition" and could die if removed from the hospital; and

(3) OMC should have alerted security and/or social workers. But Dr. Fortunato's report speculates as to how social workers could have been alerted in the middle of the night, what alerting security or social workers would have accomplished, what authority they had to retain a child in OMC when the custodial parent wanted to remove the child to their home or another hospital, and how they could have responded to the alert in such a way or at such a time as to have affected D-Angelo's care.

Dr. Fortunado's report is the only one that includes any reference to a time frame. It states that, if D-Angelo had received care in the emergency room within one-to-two hours of his arrival there, his condition would not have deteriorated to the point of causing his death. But Dr. Fortunato's report does not otherwise explain how or if it was possible for a third party to have prevented D-Angelo's father from removing D-Angelo from OMC and enabling medical staff to administer the necessary treatments in time to save his life. Moreover, D-Angelo arrived at the hospital at about 11:00 p.m. and left at about 2:00 a.m.—a three-hour period that exceeds the one-to-two hours identified by Dr. Fortunato as essential and during which OMC and Dr. Hunter were actively assessing and treating D-Angelo.

The district court determined that Dr. Fortunado's expert report was insufficient because it "does not establish what alerting security or social workers will do, what authority those groups have to keep D-Angelo in the hospital, or the timing of their response or decisions relating to D-Angelo's care."

**Dr. David Markenson's report**

Dr. Markenson's supplemental report stated that the standard of care "required OMC to keep D-Angelo both to ensure his safety and due to his emergent and unstabilized medical condition until the common entry point [CEP] responded and, in a situation where the [CEP] was unavailable to respond." The district court quoted Dr. Markenson's views that discharging D-Angelo was a "'clear violation of the standard of care'" because doing so was "'guaranteed to lead to D-Angelo's disease process progression, worsening organ system dysfunction and an eventually irreversible state leading to D-Angelo's demise'" and that "'allowing [D-Angelo's father] to take D-Angelo out [against medical advice] thus deprived D-Angelo of the care he required and caused his death."

The district court determined that the links in Dr. Markenson's chain were: (1) OMC staff prevents D-Angelo's father from removing him from the hospital; (2) OMC contacts CEP and waits for a response; (3) OMC waits for CEP's response even if CEP is unavailable to respond; (4) CEP responds; and (5) D-Angelo would have been treated and survived. The first link speculated that OMC staff could prevent a parent from removing a small child from the hospital, whether verbally or physically; the second and third links speculated as to both how long a CEP response should be waited for and what was to happen to D-Angelo during the wait; the fourth link speculated that CEP could and would make an effective, appropriate response; and the fifth link speculated as to whether the response CEP made would have prevented D-Angelo's death.

The district court determined that Dr. Markenson's expert report was insufficient because it did not explain how OMC staff should have prevented D-Angelo's father from

leaving with D-Angelo or how making a mandatory report of child medical neglect[2] would have led to D-Angelo's treatment within an adequate time to prevent his death.

The missing link in all the experts' chains of causation is the act of a third party—whether a law enforcement officer, a security person, a social worker or child social services staff, or CEP staff—who would, either by themselves or by locating another unknown party, have prevented D-Angelo's removal from OMC or returned him to OMC and authorized, despite his parent's objections, his continued treatment by OMC and Dr. Hunter early enough to prevent the deterioration of his condition and his death. The fact that D-Angelo died just a few hours after leaving the hospital indicates that not much time would have been available. None of the reports has established how respondents' failure to involve law enforcement, or security, or social services, or CEP, was a "foreseeable, substantial factor in bringing about" D-Angelo's death. *See Rygwall*, 6 N.W.3d at 429.

Thus, the expert reports fail to establish a chain of causation—that, but for the absence of a report of medical neglect to law enforcement, or security, or social workers, or CEP personnel, D-Angelo's death would not have occurred. I would, therefore, affirm the dismissal of appellant's medical malpractice claims under Minn. Stat. § 145.682, subd. 6(c).

---

[2] Minnesota law requires a person "engaged in the practice of the healing arts" who knows or has reason to believe a child is being maltreated to "immediately report the information to the local welfare agency, agency responsible for assessing or investigating the report, police department, county sheriff, tribal social services agency, or tribal police department." Minn. Stat. § 260E.06, subd. 1(c)(1) (2024). Maltreatment includes medical neglect. Minn. Stat. § 260E.03, subds. 12,15 (2024).